UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RONALD McLEOD | : | DN 3:02CV1397 (RNC) |
| v. | : | |
| STATE OF CONNECTICUT | : | April 12, 2004 |

# PLAINTIFF'S MEMORANDUM
# IN OPPOSITION TO DEFENDANT'S
# MOTION FOR SUMMARY JUDGEMENT

THE PLAINTIFF
RONALD McLEOD


By: WILLIAM B. BARNES, ESQ.
        (ct0268)
    Rosenstein & Barnes
    1100 Kings Highway East
    P.O. Box 687
    Fairfield, CT 06824
    Tel (203) 367-7922
    Fax (203) 367-8110
    E-mail wbarnes@rosenbar.com

Plaintiff Ronald McLeod respectfully submits this memorandum in opposition to the Motion of Defendant State of Connecticut for Summary Judgment. A Local Rule 56(a)(2) Statement and an Affidavit of the Plaintiff accompany this memorandum. The facts of the case are set forth in Plaintiff's Affidavit and the Local Rule 56(a)(2) Statement and will not be repeated here. Summary Judgment should be denied because there is an issue of material fact concerning the role which Plaintiff's race and color, White, gender, Male, and marriage to a Hispanic woman played in the adverse actions against him.

## SUMMARY JUDGEMENT IS DISFAVORED IN EMPLOYMENT DISCRIMINATION CASES

Summary judgment is governed by Fed. R. Civ. P. 56. "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [1]  A fact is "material" if it "might affect the outcome of the suit under the governing law." [2]  A fact issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [3]

---

[1]  Fed. R. Civ. P. 56(c).

[2]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).

[3]  477 U.S. at 248; 350 F.3d at 47.

The burden is on the moving party to establish the absence of any material factual issues.[4]  The motion must be denied if the moving party fails to establish the absence of even one issue of material fact.[5]

In determining whether there are genuine issues of material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.[6]  Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper.[7]  The court may only grant the motion it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.[8]  If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.[9]  In determining whether a genuine issue actually exists and, thus, whether or not summary judgment is appropriate, courts may not weigh the evidence, but are instead required to view the evidence in the light most favorable

---

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[5] *Hughes v. City of Stamford*, No. 3:01CV2325 (DJS), 2004 U.S. Dist. LEXIS 5480, *17-*19  (D. Conn. Mar. 29, 2004) (denying summary judgment because defendant failed to establish lack of genuine issue of material fact as to some incidents relied upon by plaintiff).

[6] *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

[7] *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 116 L. Ed. 2d 117, 112 S. Ct. 152 (1991).

[8] *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 685 (2d Cir. 2001) (per curiam).

[9] *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir. 2000); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.[10]  The court does not assess witness credibility on a motion for summary judgment.[11]

At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer.[12]  A court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.[13]

Trial courts must be especially chary in handing out summary judgment in discrimination cases.

> As the Supreme Court has stated, "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."  *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998).  As a result, when a court too readily grants summary judgment, it runs the risk of

---

[10]  *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003); *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 255; Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

[11]  *Neidich v. Estate of Neidich*, 222 F. Supp. 2d 357, 368 (S.D.N.Y. 2002) (fact that court doubts witness irrelevant; her statements create issue of fact).

[12]  *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001)*; Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000); *Stern*, 131 F.3d at 314; *cf. Washington v. Davis*, 426 U.S. 229, 242, 48 L. Ed. 2d 597, 96 S. Ct. 2040 (1976) (holding that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts").

[13]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2109, 147 L.Ed.2d 105 (2000); *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000).

providing a protective shield for discriminatory behavior that our society has determined must be extirpated.[14]

Another reason why courts should be reluctant to grant summary judgment to employers is that direct evidence of discriminatory intent is rare and must frequently be inferred from circumstantial evidence found in affidavits and depositions.[15]  The United States Supreme Court emphasized the great importance of circumstantial evidence in employment discrimination cases when it held in *Desert Palace, Inc. v. Costa* that a plaintiff did not need direct evidence to obtain a mixed motive jury instruction.[16]

> We have often acknowledged the utility of circumstantial evidence in discrimination cases.  For instance, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000), we recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of circumstantial evidence that is probative of intentional discrimination." *Id.*, at 147, 147 L. Ed. 2d 105, 120 S.Ct. 2097 (emphasis added). The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n. 17, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957).[17]

---

[14]  *McGinest v. GTE Service Corp.*, ___ F.3d ___ , No. 01-57065, 2004 U.S. App. LEXIS 4632, *17-*18 (9th Cir. Mar. 11, 2004); *cf. Gallager v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998) ("Whatever the early life of a federal judge, she or he usually lives in a narrow segment of the enormously broad American socio-economic spectrum, generally lacking the current real-life experience required in interpreting subtle ... dynamics of the workplace... .").

[15]  *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir. 2001)*; Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)*; Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).

[16]  539 U.S. 90, 156 L.Ed.2d 84, 123 S.Ct. 2148 (2003).

[17]  539 U.S. at 94; *see also* Abraham Lincoln, *Unsent Letter to J. R. Underwood and Henry Grider*, *in The Quotable Lawyer* 323 (David Schrager and Elizabeth Frost eds. 1986) ("We better know there is a fire whence we see much smoke rising than we could know it by one or two witnesses swearing to it.  The witnesses may commit perjury, but the smoke cannot.").

In most employment discrimination cases direct evidence of the employer's motivation is unavailable or difficult to acquire precisely because employers deliberately try to hide their motivations.[18]  "Employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence."[19]   Employers are rarely so cooperative as to include a notation in the personnel file that an adverse action was taken for a reason expressly forbidden by law.[20]  A plaintiff charging discrimination can seldom produce a smoking gun [21] or eyewitness testimony of the employer's mental processes.[22]  He or she may find it hard to get any witnesses at all.

> Not uncommonly in such actions, other witnesses and participants with direct knowledge of the events are co-workers still on the payroll or under the supervision or control of the accused employer or wrongdoer.  By reason of their dominant loyalties or biases, such persons may either be reluctant to get involved in a controversy against the company or to give an account of events that may contradict, embarrass or otherwise offend their supervisors.  Thus, it is not unusual in these cases for defendants, in response to plaintiff's discrimination charge, to muster from among the ranks of their employees a uniform phalanx of opposition testimony and other evidence denying the victim's accusations or otherwise casting doubt on the veracity of her account.  Consequently, it is generally more difficult for a plaintiff to count on fellow workers with direct

---

[18]  *Chambers*, 43 F.3d at 37; *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir.1988), citing *Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir. 1984).

[19]  *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991); *Lotosky v. Univ. of Rochester*, 192 F. Supp. 2d 127, 134 (W.D.N.Y. 2002).

[20]  *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-65 (2d Cir. 1989).

[21]  *See Song*, 957 F.2d at 1047; *Rosen*, 928 F.2d at 533; *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.1990); *Dister*, 859 F.2d at 1112.

[22]  *Dister*, 859 F.2d at 1112.

knowledge or involvement in the underlying events to step forward
voluntarily to confirm the complainant's version of the facts.[23]

Plaintiffs of necessity must often rely on circumstantial evidence, the fair

inferences which the chain of events may supportably yield, and jury assessments

of the credibility of the parties and witnesses.[24]  The inferences to be drawn in Title

VII cases, and the allocation of burdens and imposition of presumptions in those

cases, recognize this reality.[25]  It would eviscerate the purposes and do violence to

the spirit of the discrimination laws were dismissal of a plaintiff's case compelled

as a matter of law merely because he may not have personal knowledge,

documented or corroborated by direct proof, of particular facts to which he attests

in support of his claims.[26]  For all of these reasons summary judgment is ordinarily

inappropriate in a Title VII action where a defendant's intent and state of mind are

placed in issue.[27]

### THE SUPREME COURT HAS REDUCED
### the BURDEN ON EMPLOYEES TO
### ESTABLISH DISCRIMINATORY MOTIVE

*Desert Palace v. Costa* changed proof of discrimination by circumstantial

evidence in Title VII cases.  There is no longer any distinction between pretext and

---

[23] *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 716 (S.D.N.Y. 2003).

[24] *Id.*

[25] *Chambers*, 43 F.3d at 37; *Dister*, 859 F.2d at 1112.

[26] *Parrish*, 253 F. Supp. 2d at 716.

[27] *Rosen*, 928 F.2d at 533. *see Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1073
(9th Cir. 2004) (little evidence required to survive summary judgment because the ultimate question
may only be resolved by a searching inquiry of the full record by a fact finder; without such an
inquiry those acting for impermissible motives "could easily mask their behavior behind a complex
web of *post hoc* rationalizations... ," *quoting Sischo-Nowejad v. Merced Cmty. Coll. Dist.*, 934 F.2d
1104, 1111 (9th Cir. 1991)); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

mixed-motive cases.  A plaintiff may now prevail if he or she can prove by a preponderance of the evidence, direct or circumstantial, that a single, illegitimate motive was a motivating factor in an employment decision.

Plaintiffs formerly had two choices.  Under the "pretext" pattern set in *McDonnell Douglas Corp. v. Green*,[28] they could prove race or gender discrimination by showing 1) they belonged to a protected class; 2) they were qualified for the position; 3) they had suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.[29]  Once the prima facie case had been established, the defendant was required to offer a legitimate, non-discriminatory rationale for its actions.[30]  To defeat summary judgment plaintiffs' admissible evidence must then have showed circumstances which would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not "based in whole or in part" on discrimination.[31]

Under the "mixed motive" pattern in *Price Waterhouse v. Hopkins*,[32] if plaintiffs brought forward evidence sufficient to allow a trier to find both forbidden and permissible motives,[33] the burden shifted to the defendant to show that the

---

[28]  411 U.S. 792, 36 L.Ed.2d 668, 93 S.Ct. 1817 (1973).

[29]  *Terry*, 336 F.3d at 138; *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).

[30]  *McDonnell Douglas*, 411 U.S. at 802; *Terry*, 336 F.3d at 138.

[31]  *Terry*, 336 F.3d at 138; *Stern*, 131 F.3d at 312.

[32]  490 U.S. 228, 104 L.Ed.2d 268, 109 S.Ct. 1775 (1989).

[33]  *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997)*; Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992).

same adverse action would have been taken even if there were no discriminatory motivating factor.[34]  The Second Circuit preferred direct evidence of both forbidden and permissible motives but particularly strong circumstantial evidence could suffice.[35]

_Desert Palace_ held that a plaintiff did not need to make a heightened showing by direct evidence to obtain a mixed motive jury instruction under _Price Waterhouse_.[36]  The Court based its decision on two sections of the Civil Rights Act of 1991:

> Except as otherwise provided in this title [42 U.S.C. §§ 2000e et seq.], an unlawful employment practice is established when the complaining party _demonstrates_ that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.[37]
>
> . . . . .
>
> On a claim in which an individual proves a violation under section 703(m) [42 U.S.C. §§ 2000e-2(m)] and a respondent _demonstrates_ that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court- (I) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 703(m) [42 U.S.C. §§2000e-2(m)]; and (ii) shall not award damages or issue an order

---

[34]  _Ostrowski_, 968 F.2d at 182.

[35]  _Lightfoot_, 110 F.3d at 913; _Raskin v. Wyatt Co._, 125 F.3d 55, 61 (2d Cir. 1997) ("To warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." (internal citations omitted)); _Fields v. New York State Office of Mental Retardation & Developmental Disabilities_, 1997 U.S. App. LEXIS 19794, *19-*20 (2d Cir.) ("We have emphasized, however, that for a plaintiff to be able to insist on a dual motivation charge, there must either be direct evidence of discrimination, _Tyler_ [_v. Bethlehem Steel Corp._], 958 F.2d [1176 (2d Cir. 1992)] at 1187, or circumstantial evidence that is 'tied directly to the alleged discriminatory animus,' _Ostrowski_, 968 F.2d at 182.  This latter approach has been called the 'circumstantial-plus' standard."), _correcting_ 115 F.3d 116 (2d Cir. 1997).

[36]  156 L.Ed.2d at 90.

[37]  42 U.S.C. §§ 2000e-2(m).

> requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).[38]

Section 2000e-2(m) unambiguously states that a plaintiff need only "demonstrate" that an employer used a forbidden consideration with respect to "any employment practice." [39]  Title VII defines the term "demonstrates" as to "meet the burdens of production and persuasion." [40]  These burdens are no more than proof by a preponderance of the evidence.[41]  No direct evidence or other heightened showing is necessary.[42]  "In order to obtain an instruction under §§ 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" [43]

*Desert Palace* was decided on June 9, 2003.[44]  Four days later the United States District Court for the District of Minnesota held in *Dare v. Wal-Mart Stores, Inc.*,[45] that *Desert Palace* had in effect demolished the *McDonnell Douglas* scheme in motions for summary judgment. [46]  Not only was the concept of a single motive

---

[38]  42 U.S.C. § 2000e-5(g)(2)(B) (emphasis added).

[39]  156 L. Ed. 2d at 94.

[40]  42 U.S.C. § 2000e(m).

[41]  156 L. Ed. 2d at 94.

[42]  *Id.*

[43]  156 L. Ed.2d at 95-96.

[44]  539 U.S. 90.

[45]  267 F. Supp.2d 978.

[46]  *Id.* at 990-93; *see Disher v. Weaver*, 102 CV 00529, 2004 U.S. Dist. LEXIS 3849, *9 n.5 (M.D.N.C. Feb. 20, 2004) (holding that *Desert Palace* applied in the context of summary judgment and citing cases).

for an employment decision, legitimate or illegitimate, a legal fiction,[47] under *McDonnell Douglas*, the *Dare* court reasoned, it would be possible for an employer who had in fact been motivated by an illegal factor to prevail if the employee could not prove that other legitimate factors motivating the employer were pretextual, a result prohibited by 42 U.S.C. § 2000e-2(m).[48]  "[T]he plain language of the statute allows a plaintiff to prevail if he or she can prove by a preponderance of the evidence that a single, illegitimate motive was a motivating factor in an employment decision, without having to allege that other factors also motivated the decision." [49]

Other courts have reached the much the same conclusion.  Some follow *Dare* in holding that there is a single method of proof by circumstantial evidence.[50] Others agree that *Desert Palace* eliminated much of the distinction between the methods of proof but apply both anyway.[51]  Some use the pattern of proof

---

[47]  *Id.* at 991-92.

[48]   *Id.*

[49]  *Id.* at 991.

[50]  *See, e.g., Curry v. The Hon Co.*, Civil No. 4:02-CV-10233, 2004 U.S. Dist. LEXIS 3329, *10- *14 (S.D. Ia. Feb. 26, 2004); *Veeder v. Cargill, Inc.*, Civil No. 02-1711 (PAM/RLE), 2003 U.S. Dist. LEXIS 23245, *18-*19 (D. Minn. Dec. 23, 2003); *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1008-10 (D. Minn. 2004); *LeClair v. Wells Fargo Bank of Iowa, N.A.*, 291 F.Supp.2d 873, 880 S.D. Ia. 2003); *Shomsky v. Speedway SuperAmerica, LLC*, 267 F.Supp.2d 995, 998-1000 (D. Minn. 2003); *Jackson v. Catholic Charities*, Civ. File No. 02-1222 (PAM/RLE), 2003 U.S. Dist. LEXIS 20155, *6 & n. 1 (D. Minn. Nov. 3, 2003) ("the burden shifting of *McDonnell Douglas* is no longer good law")*; Griffith v. City of Des Moines*, 4-01-CV-10537, 2003 U.S. Dist. LEXIS 14365, *37-*40 (S.D. Ia. July 3, 2003); *Campetti v. Career Educ. Corp.*, Civil Action No. 02-CV-1349, 2003 U.S. Dist. LEXIS 12202, *20-*30 (E.D. Pa. June 26, 2003); *cf. Walker v. Bd. of Regents,* 300 F.Supp.2d 836, 849-50 (W.D. Wis. 2004) (pretext analysis only one of many kinds of proof plaintiff may use to meet his burden under *Desert Palace* to show that discriminatory animus was a motivating factor in the challenged decision).

[51]  *See, e.g., Felton v. East Baton Rouge Sch. Bd.*, Civ. A. No. 01-493-B-M3, 2003 U.S. Dist. LEXIS 23741, *9 (M.D. La. Dec. 19, 2003) (hard to distinguish between pretext and mixed motive proof after *Desert Palace* but no need to decide which to use since summary judgment

(continued...)

articulated in *Dare* without deciding whether it has supplanted that found in

*McDonnell Douglas*.[52]  Some courts, notably the Northern District of Iowa in

*Dunbar v. Pepsi-Cola General Bottlers of Iowa, Inc.*,[53] say that the Court's

reasoning in *Desert Palace* modified, but did not eliminate, the *McDonnell Douglas*

scheme and allow the plaintiff, when faced with a legitimate, nondiscriminatory

reason, to come forward with either proof of pretext, completing the pretext

analysis, or evidence of an illegal reason, triggering a mixed motive analysis.[54]

---

[51] (...continued)
inappropriate under either one); *cf. Stegall*, 350 F.3d at 1066-68,1071-72 (plaintiff survives summary judgment whether proof analyzed under *McDonnell Douglas* or under *Desert Palace*; a .plaintiff need not plead either method to rely upon it); *Vogan v. US Oncology, Inc.*, 310 F.Supp.2d 1038, 2003 U.S. Dist. LEXIS 25052, *13 (W.D. Mo. 2003) (court "seriously questions the continued viability of the McDonnell Douglas burden shifting paradigm," citing *Dare* and cases following it, but will use *McDonnell Douglas* since result the same regardless which method of proof used); *Thomas v. Chrysler Fin., LLC*, 278 F.Supp.2d 922, 926 (N.D.Ill. 2003) (Seventh Circuit precedent on pretext appears inconsistent with *Desert Palace* and should be reexamined but court will not do so since plaintiff could not prevail under any standard).

[52] *See, e.g., Rowland v. American Gen. Fin., Inc.*, 340 F.3d 187, 192 n.4 (4th Cir. 2003) (declining to hold that *Desert Palace* applies outside the mixed motive context but finding that a relatively small amount of circumstantial evidence entitled plaintiff to a mixed motive jury instruction); *Williams v. City of Memphis*, No. 02-2080-D/A, 2003 U.S. Dist. LEXIS 17620, *15-*17 (W.D. Tenn. Sept. 29, 2003) (using new proof pattern without saying that it is the only one); *Knutson v. Ag Processing, Inc.*, 273 F.Supp.2d 961, 994-95 (N.D. Ia. 2003) (noting new *Desert Palace* pattern of proof while using that found in *McDonnell Douglas*); *cf. McGinest*, 2004 U.S. App. LEXIS 4632 at *46-*50 (the third stage of *McDonnell Douglas*, after the plaintiff has made out a prima facie case and the defendant has articulated a legitimate nondiscriminatory reason, is basically the same as a mixed motive analysis under *Desert Palace*); *Strauch v. American Coll. of Surgeons*, 310 F.Supp.2d 839, 2004 U.S. Dist. LEXIS 1411, *11-*14 (N.D. Ill. 2004) (eliminating all distinction between pretext and mixed motive patterns of proof undesirable due to differences in remedy, but skipping to last stage of pretext analysis as modified by *Desert Palace* - plaintiff need not show pretext, but only reason to believe discrimination motivated decision - makes it the functional equivalent of mixed motive analysis); *but cf. Herawi v. Alabama Dept. of Forensic Scis.*, Civ. A. No. 2:02cv1360-T, 2004 U.S. Dist. LEXIS 5706, *20-*24 (M.D. Ala. April 5, 2004) (*McDonnell Douglas* scheme a useful heuristic tool worthy of preservation; court need not abandon it as a result of *Desert Palace*).

[53] 285 F.Supp. 2d 1180 (2003).

[54] *See, e.g., Hernandez v. Hughes Missile Sys. Co.*, ___ F.3d ___ , No. 01-15512, 2004 U.S. App. LEXIS 5402, *10 (9th Cir. Mar. 23, 2004) (once defendant stated reasons for its action under *McDonnell Douglas*, court could consider, not only evidence of pretext, but any evidence, direct or indirect, which suggested an illegitimate motivation); *Disher*, 2004 U.S. Dist LEXIS 3849 at *18-*22; *Lloyd v. City of Bethlehem*, Civil Action, No. 02-CV-00830, 2004 U.S. Dist. LEXIS 3639,
(continued...)

-11-

The Second Circuit has not discussed this issue.  There is reason to believe, however, that it would find that *Desert Palace* converted the *McDonnell Douglas* pattern to something resembling that described in *Dunbar*.  The defendants in *Terry v. Ashcroft* argued on summary judgment that the plaintiff did not prove that the stated reason for a retaliatory action was pretextual.[55]  The Second Circuit disagreed, and stated in a footnote:

> We note that the fact that Terry's EEO complaint might not have been the only reason why he was not hired does not change our analysis. *See Desert Palace, Inc. v. Costa*, 156 L.Ed.2d 84, 123 S.Ct. 2148 (2003); *Gordon v . New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).[56]

Academic commentators unanimously agree that the pretext pattern of proof no longer exists in any context.  Henry L. Chambers, Jr., a professor at the University of Missouri-Columbia, recently wrote that after *Desert Palace*, "the pretext case and the circumstantial evidence, mixed-motive cases are the same." [57] William R. Corbett, a professor at Louisiana State University, said "the old

---

[54]  (...continued)
*8-*14 (E.D. Pa. Mar. 1, 2004); *Carlsen v. Green Thumb, Inc.*, Civil No. 01-2076 (JRT/RLE), 2004 U.S. Dist. LEXIS 1781, *20-*21 & n. 9 (D. Minn. Feb. 4, 2004); *Ordahl v. Forward Technology Indus., Inc.*, 301 F.Supp.2d 1022, 2004 U.S. Dist. LEXIS 1780, *6-*10 (D. Minn. 2004); *Torlowei v. Target*, Civil No. 02-933 (MJD/JGL), 2004 U.S. Dist. LEXIS 1475, *8-*12 (D. Minn. Feb. 3, 2004); *Lambert v. Potter*, Civ. No. 00-2580, 2004 U.S. Dist, LEXIS 1477, *16-*17 (D. Minn. Feb. 2, 2004); *Brown v. Westaff (USA), Inc.*, 301 F.Supp.2d 1011, 2004 U.S. Dist. LEXIS 446, *9-*17 (D. Minn. 2004); *Rishel v. Nationwide Mut. Ins. Co.*, 297 F.Supp.2d 854, 2003 U.S. Dist. LEXIS 23463, *11-*30 (M.D.N.C. 2003); *Dunbar*, 285 F.Supp. 2d at 1191.

[55]  *Terry*, 336 F.3d at 142.

[56]  336 F.3d at 142 n.12.  *Gordon* is a mixed motive retaliation case; the page cited in *Terry* states, relying on the 1991 amendments to Title VII, that a plaintiff need not disprove all of the employer's nondiscriminatory reasons for the challenged action to prevail so long as he shows that one motive was illegitimate.

[57]  Henry L. Chambers, Jr., *The Effect of Eliminating Distinctions Among Title VII Disparate Treatment Cases*, 57 SMU L. Rev. 83, 98 (2004).

-12-

*McDonnell Douglas* proof structure is as dead as a doornail." [58]  Jeffrey A. Van

Detta, Associate Professor at John Marshall Law School, agreed: "*McDonnell*

*Douglas v. Green* is dead." [59]

   *Desert Palace* eliminated "circumstantial - plus" - the concept that plaintiffs

must meet a heightened standard to take advantage of mixed-motive analysis.[60]  A

plaintiff may now prevail if he or she can prove by a preponderance of the

evidence, direct or circumstantial, that an illegitimate motive was a motivating

factor in an employment decision.

**THERE IS SUFFICIENT EVIDENCE OF
DISCRIMINATORY MOTIVATION IN THIS CASE TO
CREATE A GENUINE ISSUE OF MATERIAL FACT**

   Inferences appropriately drawn from facts in the record create a genuine

question whether race, color, gender and association with a Hispanic, or any of

them, were motivating factors in the employment decisions which adversely

affected Plaintiff.

---

   [58]  William R. Corbett, *McDonnell Douglas, 1973-2003: May You Rest in Peace?*, 6 U. Pa. J. Lab. & Emp. L. 199, 200 (2003).

   [59]  Jeffrey A. Van Detta, *"Le Roi Est Mort; Vive Le Roi!": an Essay on the Quiet Demise of McDonnell Douglas and the Transformation of Every Title VII Case after Desert Palace, Inc. v. Costa into a "Mixed-Motives" Case*, 52 Drake L. Rev. 71, 72 (2003).

   [60]  *See Desert Palace,* 156 L.Ed.2d at 93-95 (demonstrates means ordinary proof by a preponderance of the evidence; there is no heightened proof requirement); *cf. Johnson v. Kingston*, 292 F.Supp.2d 1146, 1153 ("It seems fair to infer that when Congress amended Title VII and used the word 'motivating,' it agreed with the concurring justices' belief [in *Price Waterhouse*] that motivating is an easier standard to prove than substantial.  *See* 42 U.S.C. § 2000e-2(m) ("an unlawful employment practice is established when the complaining party demonstrates that [a protected criterion such as sex] was a motivating factor for any employment practice.. .")").

Plaintiff, a White male,[61] was a minority in his workplace.  Over 68% of DSS employees are female and almost exactly one third are members of groups classified as minority groups in the general population (African-American, Hispanic, Asian, etc.).[62]

Plaintiff's race was made an issue by Georgette Fountain, a Black female DSS employee.[63]  Ms. Fountain brought her race, and Plaintiff's race, into her initial dispute with Plaintiff over her performance.[64]  When Ms. Fountain sent a letter to her union representative, Keith Gatling, a Black man, charging Plaintiff with abusive behavior, she again made race an issue by copying the letter to the NAACP.[65]

These references to race were wholly unnecessary.  Talk about race is strictly forbidden in the DSS workplace.[66]  Plaintiff could have made a complaint against Ms. Fountain but chose not to since he did not want to make the problem worse.[67]

The Commissioner of DSS, Patricia Wilson-Coker, is a Black woman.[68] Plaintiff's manager, Gail Scott, is a Black woman.[69]  Brenda Harris, the DSS employee who investigated the Fountain incident for DSS Affirmative Action, is a

---

[61]  Pl. Aff. ¶ 2.

[62]  Pl. Aff. ¶ 2 & Pl. Ex. B.

[63]  Scott Dep. Tr. 16, lines 21-23.

[64]  Pl. Aff. ¶ 6 ("Ms. Fountain became angry and indignant.  She shook her finger at me and said 'Don't you ever tell a Black woman she can't do something.'").; Pl. Aff. ¶ 7, Pl. Exs. D & E.

[65]  Pl. Aff. ¶S 13 & 20, Pl. Ex. O; Def. SJ Ex. 3.

[66]  Pl. Aff. ¶ 7, Pl. Ex. F.

[67]  Pl. Aff. ¶ 7.

[68]  Pl. Aff. ¶ 18.

[69]  Scott Dep. Tr. 8, lines 5-10.

Black woman.[70]  Lynn Gelzheiser, the DSS employee who investigated the Fountain incident for DSS Human Resources, is a White woman.[71]  Rudolf Jones, the head of DSS Human Resources and the individual who approved discipline of Plaintiff on account of the two incidents at issue, is a Black man.[72]  None of the people who investigated Plaintiff and decided whether and how to discipline him for the Fountain incident were White men.

Ms. Fountain's letter to Mr. Gatling should have turned into a grievance under the collective bargaining agreement.  Management should have insisted on it. Defendant instead turned the letter into a race discrimination complaint and a workplace violence complaint.  This shows bias against Plaintiff on account of his race and color, White, and his gender, male.

Ms. Fountain initiated and continued the hostile confrontation with Plaintiff [73] and was loud and abusive towards Plaintiff.[74]  The Violence in the Workplace Manual, available to DSS HR managers September, 1999,[75] says that shouting, harassing and intimidation are strictly forbidden.[76]  "Violence" includes "intimidating or threatening behaviors" and "verbal abuse." [77]  Early warning signs of workplace violence include "numerous conflicts with supervisors" and "reduced productivity."

---

[70]  Harris Dep. Tr. 7, lines 12-16.

[71]  Pl. Aff. ¶ 16.

[72]  Pl. Aff. ¶ 23.

[73]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[74]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[75]  Pl. Ex. I, title page.

[76]  Pl. Ex. I at 3.

[77]  Pl. Ex. I at 4.

[78] "Negative performance review," "unwelcome change in role due to performance or reorganization issue." "criticism of performance," "conflict with … supervisor," and "increased workload or pressure, e.g., deadlines, projects, etc." are all identified by the Manual as "common issues triggering workplace violence." [79] These criteria suggest that Ms. Fountain was the problem.  Since Ms. Fountain, not Plaintiff, violated the Governor's policy against violence in the workplace, Ms. Fountain, not Plaintiff, should have been the subject of further investigation.  This conclusion is supported by the "threat assessment" portion of the Manual.[80]  The State's failure to investigate Ms. Fountain, coupled with its immediate investigation of Plaintiff, shows racial and gender bias.[81]

Plaintiff was treated far worse than his accuser.[82]  Ms. Fountain not only escaped investigation and punishment, but as a direct result of her complaint got to keep her job.  Ms. Scott asked permission to transfer Ms. Fountain due to serious and longstanding performance deficiencies.  Since Ms. Scott was a Black woman she was presumably free from racial and gender bias against Black women.  Ms. Harris, citing "Department policy," would not permit the transfer.[83]

---

[78]  Pl. Ex. I at 13 & 14.

[79]  Pl. Ex. I at 14.

[80]  Pl. Ex. I at 15-17.

[81]  The Second Circuit recently condemned gender stereotyping in *Back v. Hastings on Hudson Union Free School Dist.*, ___ F.3d ___ , Docket No. 03-7058, 2004 U.S. App. LEXIS 6684, *19-*22 (April 7, 2004).

[82]  Since Plaintiff is relying on the *Desert Palace* scheme, not the *McDonnell Douglas* scheme, he need not identify comparable Black or female supervisors who were treated better than him.

[83]  Scott Dep. Tr. 30, lines 22-25, page 31, lines 1-10.

Defendant's handling of the Fountain incident was conspicuously unfair to Plaintiff. No one in management, no one in Affirmative Action, and no one in Human Resources showed Plaintiff the complaint Ms. Fountain had made against him.[84] The investigation was over, and the disciplinary process had begun, before he saw the letter or was given a copy.[85]

Affirmative Action and Human Resources investigated Plaintiff together. Ms. Gelzheiser worked with Ms. Harris.[86] Affirmative Action found no cause to believe that racism had anything to do with Plaintiff's conduct in the incident, and prepared a report to that effect,[87] but did not advise Plaintiff that he had been cleared of the most serious charge against him and never gave a copy of the report to Plaintiff and his representatives for use in the disciplinary process.[88] Human Resources knew that Affirmative Action had cleared Plaintiff of the racism charge [89] but it never advised him of that fact and conducted the disciplinary process as if he had not been cleared.[90]

Plaintiff was accused of breaching the Governor's Policy for Prevention of Violence in the Workplace. At the time of the Fountain incident there were no

---

[84] Pl. 18 & 20, Pl. Ex. O.

[85] Pl. Aff. ¶ 20.

[86] Gelzheiser Dep. Tr. 117, lines 21-25.

[87] Harris Dep. Tr. 68, lines 24-25, page 69, line 1.

[88] Harris Dep. Tr.  74, lines 9-25, page 75, lines 1-25, page 76, lines 1-23.

[89] Harris Dep. Tr. 77, lines 9-24.

[90] Pl. Aff. ¶ 30.

materials explaining the policy to managers such as Plaintiff [91] and the Bridgeport Office of DSS where Plaintiff worked had not received any training in the policy.[92] Since on its face it was Ms. Fountain, not Plaintiff, who had violated the policy,[93] Plaintiff did not know, and could not have known, that his conduct on May 22, 2000 would be taken to have violated the policy.[94]

The statements attached to Ms. Gelzheiser's report on the Fountain incident report show that she had taken her witness statements in June and July, 2000, but none of them were signed until the 26 day period in August when Plaintiff was on suspension as a result of the Onofrio complaint.[95] Ms. Gelzheiser did not render a report until Aug. 28, 2000, ninety-eight days after the Fountain complaint.[96] The inference is strong that Ms. Gelzheiser held her report on the Fountain incident until she had another complaint.

Mr. Jones relied upon the report written by Ms. Gelzheiser when he gave Plaintiff four days suspension without pay [97] for his conduct in the Fountain incident.[98] That report reveals a strong bias against Plaintiff.

Ms. Gelzheiser did not require Ms. Fountain to sign her statement although the Violence in the Workplace manual for use by HR representatives in State

---

[91]  Pl. Aff. ¶ 11; Gelzheiser Dep. Tr. 10, lines 1-21, page 11, lines 1-25.

[92]  Pl. Aff. ¶ 11; Gelzheiser Dep. Tr. 13, lines 2-15, page 15, lines 2-9.

[93]  Pl. Aff. ¶s 13-15.

[94]  Pl. Aff. ¶ 19.

[95]  Pl. Aff. ¶s 21, 23-24.

[96]  Pl. Aff. ¶ 23, Doc. 1-000574 through 1-000577, Pl. Ex. R.

[97]  See Pl. Aff. ¶ 31, Doc. 21-0000659, Pl. Ex. W.

[98]  Jones Dep. Tr. 24, lines 2-20.

agencies requires signed statements.[99]  Since Ms. Fountain's letter to Mr. Gatling was not signed,[100] Ms. Fountain never had to commit herself to any particular version of the facts.

Ms. Gelzheiser used statements taken by Keith Gatling.  The statements were not reliable since Mr. Gatling was acting as Ms. Fountain's advocate at the time.[101]  Ms. Gelzheiser allowed Mr. Gatling to line up the witnesses, pre-interview them and later sit in on her interviews as the union representative of the witnesses.[102]  The witnesses discussed their stories with each other.[103]

Despite evidence to the contrary Ms. Gelzheiser never explored the possibility that Ms. Fountain, not Plaintiff, had violated the workplace violence policy.[104]

Ms. Gelzheiser omitted material facts which favored Plaintiff.  Ms. Fountain initiated the incident by accosting Plaintiff in a loud voice.[105]  Ms. Fountain was openly hostile to Plaintiff from the very start of the incident [106]  because two days before he had sent her an e-mail appropriately criticizing, in measured, businesslike

---

[99]  Pl. Aff. ¶ 21, Pl. Ex. P at 1-000574 through 1-000575, Pl. Ex. I at 50.  Ms. Gelzheiser testified at deposition that there were no rules governing her investigation.  Gelzheiser Dep. Tr. 10, lines 13-21, page 11, lines 1-25.

[100]  See Pl. Ex. O, Def. SJ Ex. 3.

[101]  See J. Myers Statement, dated June 6, 2000, Doc. 1-000596; S. Lee, Doc. 1-0000606, Pl. Ex. S.

[102]  Gelzheiser Dep. Tr. 106, lines 4-25, page 109, lines 2-25, page 111, lines 1-25.

[103]  Pl. Aff. ¶ 25.

[104]  See Report, dated Aug. 28, 2000, Pl. Ex. R.

[105]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[106]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

language, her backlog of overdue work.[107]   The day of the incident was the first day after Ms. Fountain received the e-mail that both she and Plaintiff were at work.[108]   Ms. Fountain refused three attempts by Plaintiff to move discussion of her grievances to a private office or conference room.[109]   While Plaintiff had a twenty-one year history of outstanding performance and promotions and had received an excellent review from Ms. Scott only six months before,[110] Ms. Fountain was a marginal employee facing discipline or transfer.[111]   Plaintiff, who according to Ms. Fountain was a White racist, was engaged to a Hispanic woman.[112]

Ms. Gelzheiser's report fails to mention the meeting held later on May 22, 2000 to address Ms. Fountain's concerns.  Ms. Fountain, Ms. Scott, Mr. Gatling and Plaintiff sat down together.  That meeting resulted in an agreement.  Ms. Fountain would have an opportunity to express her concerns about her workload and would then explore transfer out of the Unit.  At no time during that meeting did Ms. Fountain claim that Plaintiff was violent or motivated by racism.  Her racism and violence charges were made well after the fact.[113]   From this piece of evidence alone Ms. Gelzheiser should have concluded that Ms. Fountain was not believable.

---

[107]   McLeod Dep. Tr. 31, lines 23-25, page 32, lines 1-4 & Docs. 1-000592 & 1-000593, Pl. Ex. J.

[108]   McLeod Dep. Tr. 32, lines 24-25, page 23, lines 1-13.

[109]   McLeod Dep. Tr. 63, lines 4-25.

[110]   See McLeod performance review, Doc. 40-00891, dated Oct. 7, 1999, Pl. Ex. A.

[111]   McLeod Dep. Tr. 21, lines 12-14, page 36, lines 20-25.

[112]   Pl. Aff. ¶s 9, 27.

[113]   G. Scott Dep. Tr. 19, lines 3-20.

Ms. Gelzheiser and Brenda Harris, the Affirmative Action Officer, conducted a joint investigation of the Fountain incident.  Ms. Harris testified that they shared information.[114]  Ms. Fountain's statement to Ms. Harris was not the same as the statement she gave Ms. Gelzheiser.  Ms. Fountain told Ms. Harris that she felt like she "had been raped twice," a strong sexual reference.[115]  The statement to Harris was also full of details, including the claim, explosive if true, that Plaintiff had come towards her with something in his hand, apparently to hit her.[116]  Although she must have known of these discrepancies, Ms. Gelzheiser never mentioned them in her report or drew the necessary inference that Ms. Fountain was not credible.

Ms. Fountain claimed to be afraid of Plaintiff but resisted all attempts to move her out of his Unit until the job she wanted opened up.[117]  Ms. Fountain worked at a desk a short distance away from Plaintiff for over two hundred days.[118]  Ms. Gelzheiser never mentioned this fact in her report.

Ms. Gelzheiser uncritically transmitted biased and unreliable information.  Witnesses Joyce Myers, Scott MacDonald, Rosie Serrano, Seflin Lee and Robert DesPres were facially biased against Plaintiff.  MacDonald admits that he could not hear what Ms. Fountain said to Plaintiff to start the incident but nevertheless claims that he could tell that she was "nonthreatening" and "nonprovoking."  Lori Green and Susan Gwiazda, the witnesses supposedly closest to the incident, claim

---

[114]  Harris Dep. Tr. 63, lines 4-14.

[115]  Doc. 1A-000608, Pl. Ex. V.

[116]  Doc. 1A-000608, Pl. Ex. V.

[117]  G. Scott Dep. Tr. 33, lines 1-11; Pl. Aff. ¶ 26.

[118]  McLeod Dep. Tr. 155, lines 10-13.

in their statements to have seen nothing.  Robert DesPres claimed that the incident took place at 9:00 AM or 9:30 AM though every other witness places the incident at 7:30 AM.[119]

Plaintiff felt that he was discriminated against because he was a White man linked to a Hispanic woman.  On Sept. 25, 2000, he asked Ms. Harris to investigate his discrimination complaint, and on Oct. 2, 2000 he proposed a remedy for that discrimination.[120]  Ms. Harris testified at her deposition in this case that she was required to fully investigate Ms. Fountain's complaint of racism against Plaintiff because Department policy required a full investigation of every complaint of illegal discrimination.[121]  DSS policy does in fact contain such a provision.[122]  Ms. Harris neither acknowledged nor investigated Plaintiff's complaint.[123]

Mr. Jones relied upon the report written by Ms. Gelzheiser when he disciplined Plaintiff for his conduct in the Onofrio incident.[124]  That report reveals a strong bias against Plaintiff.

---

[119]  Doc. 1-00094 through 1-000604, Pl. Ex. S.

[120]  Harris Dep. Tr. 49, lines 19-24, page 83, lines 2-25; see also memos from Plaintiff to B. Harris, dated Sept. 25, 2000 and Oct. 2, 2000, Pl. Ex. T.

[121]  See DSS policy on investigation of discrimination complaints, Pl. Ex. I.

[122]  Harris Dep. Tr. 49, lines 19-24.

[123]  Pl. Aff. ¶ 29.

[124]  Jones Dep. Tr. 23, lines 21-25, page 24, lines 1-20.

Plaintiff knows, from his nine year personal relationship with Ms. Onofrio, that she is a personal friend of Ms. Gelzheiser.[125]  Ms. Gelzheiser should not have been chosen to perform this investigation.

Ms. Gelzheiser omitted material facts which favored Plaintiff.  Ms. Onofrio had a strong personal motive to injure Plaintiff.  She had been in an intermittent relationship with Plaintiff for nine years before he broke up with her and took up with Ms. Flores, also an employee in the Bridgeport office.  Ms. Onofrio was intensely and publically jealous of Ms. Flores, who had just given birth to Derek, Plaintiff's first son.  Ms. Onofrio told Plaintiff that Ms. Flores was a "fucking spic whore," accused her of sleeping with two hundred men, and claimed that Derek was not Plaintiff's son.  Ms. Onofrio's feelings were well known in the Bridgeport office because she made similar statements to other employees.  Ms. Onofrio publically referred to Derek as Plaintiff's "half spic bastard" son.[126]

Ms. Gelzheiser supposedly suspended Plaintiff because Ms. Onofrio was afraid of him.[127]  Ms. Onofrio told Ms. Gelzheiser only one day after making her accusations that she was not afraid of Plaintiff.[128]  She repeated this statement two more times, once in writing.[129]  Ms. Onofrio also said that she never wanted this to happen and did not want Plaintiff to be punished.[130]  Despite these

---

[125]  Pl. Aff. ¶ 33.

[126]  Pl. Aff. ¶ 32.

[127]  Gelzheiser Dep. Tr. 42, lines 19-25.

[128]  Gelzheiser Dep. Tr. 42, line 25, page 43, lines 1-3.

[129]  Docs. 1-000622 through 1-000625, Pl. Ex. AA.

[130]  Pl. Ex. AA.

statements Plaintiff was kept out of work for twenty-six days.[131]  The suspension exceeded by eleven days the maximum suspension permitted by Connecticut State Employee Personnel Regulations in the absence of proof that the employee's presence at work "could be harmful to the public, the welfare, health or safety of patients, inmates or state employees or state property."  The same regulations say that when such a suspension is imposed the appointing authority "shall provide written notice to the employee stating the reasons for the leave, the effective date of the leave and the duration of the leave." [132]  No such notice was given in Plaintiff's case.[133]  Even Rudolf Jones, who could hardly be expected to acknowledge that he had made a bad decision, admitted that such a long suspension was unusual and near the outer edge of permissible.[134]

    Ms. Gelzheiser coached Ms. Onofrio.  The first statement Ms. Gelzheiser took from Ms. Onofrio was vague, sketchy and did not say that Plaintiff was violent.[135]  Instead of concluding that Ms. Onofrio lacked credibility and that Plaintiff had not in fact been violent, Ms. Gelzheiser met with Ms. Onofrio again.

---

[131]  McLeod Dep. Tr. 114, lines 6-21; Gelzheiser Dep. Tr. 43, lines 12-24.

[132]  *See* Conn. Agencies Regs. § 5-240-5a(f):
An appointing authority may place an employee on leave of absence with pay for up to fifteen (15) days to permit investigation of alleged serious misconduct which could constitute just cause for dismissal under C.G.S. Section 5-240-1a (c).  Such leave shall only be utilized if the employee's presence at work could be harmful to the public, the welfare, health or safety of patients, inmates or state employees or state property.  Following a decision to place the employee on such leave, the appointing authority shall provide written notice to the employee stating the reasons for the leave, the effective date of the leave and the duration of the leave which shall not exceed fifteen (15) days.

[133]  Pl. Aff. ¶ 34.

[134]  Jones Dep. Tr. 33, lines 18-25.

[135]  See Docs. 1-000619 through 1-000621. Pl. Ex. X.

-24-

Ms. Gelzheiser testified at deposition that it was not her practice to let witnesses know what other witnesses had said, but she admitted reading the statements of Mary Jane Sadler and Keith Gatling aloud to Ms. Onofrio.[136]  She wanted Ms. Onofrio to give a statement which was consistent with those statements.[137]

Ms. Gelzheiser ignored material inconsistencies between Ms. Onofrio's four different accounts of the incident.  The first account was a verbal statement to Ms. Gelzheiser on Aug. 3, 2000.[138]  The second was a handwritten account dated Aug. 4, 2000.[139]  The third account was given to Ms. Gelzheiser in an interview held Aug. 9, 2000.  That interview was reduced to a typewritten statement signed on Sept. 22, 2000.[140]  The fourth account appears in a typewritten statement dated Aug. 17, 2000.[141]  In the first account Ms. Onofrio stated without reservation or equivocation that Plaintiff had spit in her face.  In the second account Ms. Onofrio said that she "perceived" that Plaintiff was "about to" spit at her, and turned and ran to her car.  She then "perceived" what she "believed to be" spit on the back of her hair but she did not check to see what it was.  In the third account Ms. Onofrio said that Plaintiff was upset and had a "look on his face as if he was about to spit."  She cannot say that Plaintiff spit on her hair.  In the fourth account Ms. Onofrio says that she observed Plaintiff "start to spit."  She then turned her face.

---

[136]  Gelzheiser Dep. Tr. 48, lines 4-20.

[137]  Gelzheiser Dep. Tr. 46, lines 16-24.

[138]  See Doc. 2-000614 through 2-000618, Pl. Ex. Y.

[139]  See Doc. 2-000620-2-000621, Pl. Ex. Z.

[140]  See Doc. 2-000623 through 2-000625, Pl. Ex. AA.

[141]  See Doc. 2-000622, Pl. Ex. AB.

Plaintiff did spit, but she could not be totally sure where it landed; it "may have" been on the back of her head.

Ms. Gelzheiser drew conclusions which were not justified by the evidence. Ms. Gelzheiser concluded that Ms. Onofrio's claim was credible because she told the same story to several different people, effectively relying on prior consistent statements.[142]  This conclusion is fatally flawed.  For one thing, Ms. Onofrio had given materially different statements to Ms. Gelzheiser.[143]  In addition, it is common sense as well as law that prior consistent statements may not be used as substantive evidence but only to rehabilitate a witness who has been impeached.[144] Prior consistent statements must also have been made at a time before any bias, interest or improper motive arose.[145]  Ms. Onofrio's prior statements were not made in response to impeachment, but rather to a very sympathetic listener, and were made at a time when she had a strong motive to fabricate.  It is also apparent that Ms. Gelzheiser helped Ms. Onofrio conform her statements to those reported by third parties such as Keith Gatling.

Plaintiff received a one day suspension without pay for the Onofrio incident.[146]  When combined with his four day suspension without pay for the Fountain incident, Plaintiff lost five days over these incidents, a result virtually

---

[142]  Report, Doc. 2-000614 through 2-000618, Pl. Ex. AC.

[143]  See Pl. Aff. ¶s 36, Docs. 2-000619 through 2-000622 & 2-000625, Pl. Ex. Y, Z & AA.

[144]  *See United States v. Lowe*, 65 F.3d 1137, 1143-45 (4th Cir. 1995).

[145]  *See* Conn. Code Evid. § 6-11(b)(2); Fed. R. Evid. 801(d)(1)(B); *Tome v. United States*, 513 US 150, 160, 130 L.Ed.2d 574, 115 S.Ct. 696 (1995).

[146]  See Pl. Aff. ¶ 38, Doc. 26-000666, Pl. Ex. AD.

without precedent at DSS.[147]  Ms. Gelzheiser testified that she could not remember a supervisor ever losing days on grounds like these.[148]  She also testified that she felt that the one day suspension without pay for the Onofrio incident was too severe.[149]  There should have been a written reprimand.[150]  She had written a reprimand for Mr. Jones' signature, but he decided not to use it because under principles of progressive discipline Plaintiff deserved some kind of suspension for the Onofrio incident since he had already gotten four days suspension for what he had done to Ms. Fountain.[151]

Some of the discipline for the Fountain and Onofrio incidents was remitted during the union grievance proceedings but Plaintiff still lost two days pay on account of those incidents.[152]  He also lost his reputation.[153]  Plaintiff went from being a star supervisor, with an unbroken record of achievement, to a pariah.  So many people with spotless records compete for relatively few managerial positions at DSS that Plaintiff is unlikely ever to be promoted.[154]

The above evidence, taken together, creates a material issue of fact.  One of the motives behind the adverse action taken against Plaintiff was likely prejudice

---

[147]  Pl. Aff. ¶ 38.

[148]  Gelzheiser Dep. Tr. 78, lines 19-25, page 79, lines 1-6.

[149]  Gelzheiser Dep. Tr. 75, line 12-25, page 76, lines 1-19.

[150]  Gelzheiser Dep. Tr. 77, lines 20-22.

[151]  Gelzheiser Dep. Tr. 75, lines 10-25, page 76, lines 1-19.

[152]  Pl. Aff. ¶ 39.

[153]  Pl. Aff. ¶ 39.

[154]  Pl. Aff. ¶ 39.

against him on account of his race and color, White, his gender, male, and his engagement to a Hispanic woman.

### Plaintiff Has a Title VII Claim For Discrimination Due to Association By Marriage with a Hispanic Person

Defendant agues that Plaintiff has no associational claim, but a White employee has a Title VII claim for an adverse employment action resulting from the fact that he is engaged or married to a member of a minority group.[155]  Plaintiff is White.  His wife is Hispanic.  There is evidence that anti-Hispanic bias played a motivating part in his twenty-six day suspension.  Plaintiff therefore has a Title VII claim based on his association with Ms. Flores.

### CONCLUSION

For all of the foregoing reasons Plaintiff respectfully asks that Defendant's motion for summary judgment be denied in all respects.

---

[155] *See Albert v. Carovano*, 851 F.2d 561, 572-73 (2d Cir. 1988) (approving *Parr*); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) (refusal to hire a White man due to his marriage to a Black woman actionable under Title VII); *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F.Supp. 298, 299-300 (S.D.N.Y. 1996) (firing a White man due to his marriage to a Black woman actionable under Title VII; discussing and approving *Parr*); *Green v. Mr. Omelet of America, Inc.*, C-89-529-WS, 1991 U.S. Dist. LEXIS 5119, *8-*9 (M.D.N.C. Jan. 15, 1991) (same); *Reiter v. Center Consol. School Dist. No. 26-JT*, 618 F. Supp. 1458, 1460 (D. Colo. 1985) (acknowledging rule); *Gresham v. Waffle House, Inc.*, 586 F. Supp. 1442, 1445 (N.D. Ga. 1984) (same); *see also Whitney v. Greater New York Corp. of Seventh Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975) (White employee discharged because she was dating Black man has a cause of action under Title VII); 1 Barbara Lindemann and Paul Grossman, *Employment Discrimination Law* 345-36 (3d ed. 1996 & 2002 Cum. Supp. 289); *cf. DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306 (2d Cir.), *mod. on other grounds*, 520 F.2d 409 (1975) (white person can bring a § 1981 claim alleging that he was forced into retirement because he had sold his house to an African-American person); *Lieberman v. Fine, Olin & Anderman, P.C.*, 00 Civ. 6533(JGK), 2002 U.S. Dist. LEXIS 1544, *9 n.1 (S.D.N.Y. Jan. 31, 2002); (no dispute that a White person has a § 1981 action when discriminated against due to association with minority to whom he or she is appropriately related).

THE PLAINTIFF
RONALD McLEOD


BY _____
        WILLIAM B. BARNES, ESQ.
                (ct268)
        Rosenstein & Barnes
        1100 Kings Highway East
        P.O. Box 687
        Fairfield CT 06824
        Tel (203) 367-7922
        Fax (203) 367-8110
        wbarnes@rosenbar.com

## CERTIFICATION

A copy of the foregoing was faxed and mailed first class mail, postage prepaid, on April 13, 2004 to the following counsel and pro se parties of record:

Tammy D. Geathers, Esq.
Asst. Attorney General
55 Elm Street
P.O. Box 120
Hartford CT 06141-0120


_____
WILLIAM B. BARNES, ESQ.