UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RONALD McLEOD | : | DN 3:02CV1397 (RNC) |
| v. | : | |
| STATE OF CONNECTICUT | : | April 12, 2004 |

# LOCAL RULE 56(a)(2) STATEMENT

### PART ONE:
### REPLY TO DEFENDANT'S LOCAL RULE
### 56(a)(1) STATEMENT OF UNDISPUTED FACTS

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Denied.  The words "mutual respect" appear in Pl. Dep. Tr. 59, lines 5-12, but are omitted from this paragraph.

17.    Admitted.

18.    Admitted.

19.    Denied.  Plaintiff's statements at Pl. Dep. Tr. 75, line 25, and page 76, lines 1-13, were omitted from this paragraph.

20.    Admitted.

21.    Admitted.

22.    Admitted as stated; the statement is not, however, complete.  See Part Two, below.

23.    Admitted.

24.    Admitted.

25.    Admitted.

26.    Admitted.

27.    Admitted.

28.    Admitted as stated; the statement is not, however, complete.  See Part Two, below.

29.    Admitted as stated; the statement is not, however, complete.  See Part Two, below.

30.    Admitted as stated; the statement is not, however, complete.  See Part Two, below.

31.    Admitted.

32.    Admitted.

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Denied.  Plaintiff's statements at Pl. Dep. Tr. 99, lines 21-23, were omitted from this paragraph.

38.    Denied.  Two unpaid days remained.

## PART TWO:
### ISSUES OF MATERIAL FACT AS
### TO WHICH PLAINTIFF CONTENDS

## THERE IS A GENUINE ISSUE TO BE TRIED

1.    Plaintiff, a White male,[1] was a minority in his workplace.  Over 68% of DSS employees are female and almost exactly one third are members of groups classified as minority groups in the general population (African-American, Hispanic, Asian, etc.).[2]

2.    Plaintiff's race was made an issue by Georgette Fountain, a Black female DSS employee.[3]  Ms. Fountain brought her race, and Plaintiff's race, into her initial dispute with Plaintiff over her performance.[4]  When Ms. Fountain sent a letter to her union representative, Keith Gatling, a Black man, charging Plaintiff with abusive behavior, she again made race an issue by copying the letter to the NAACP.[5]

3.    These references to race were wholly unnecessary.  Talk about race is strictly forbidden in the DSS workplace.[6]  Plaintiff could have made a complaint

---

[1]  Pl. Aff. ¶ 2.

[2]  Pl. Aff. ¶ 2 & Pl. Ex. B.

[3]  Scott Dep. Tr. 16, lines 21-23.

[4]  Pl. Aff. ¶ 6 ("Ms. Fountain became angry and indignant.  She shook her finger at me and said 'Don't you ever tell a Black woman she can't do something.'").; Pl. Aff. ¶ 7, Pl. Exs. D & E.

[5]  Pl. Aff. ¶S 13 & 20, Pl. Ex. O; Def. SJ Ex. 3.

[6]  Pl. Aff. ¶ 7, Pl. Ex. F.

against Ms. Fountain but chose not to since he did not want to make the problem worse.[7]

4.     The Commissioner of DSS, Patricia Wilson-Coker, is a Black woman.[8] Plaintiff's manager, Gail Scott, is a Black woman.[9]  Brenda Harris, the DSS employee who investigated the Fountain incident for DSS Affirmative Action, is a Black woman.[10]  Lynn Gelzheiser, the DSS employee who investigated the Fountain incident for DSS Human Resources, is a White woman.[11]  Rudolf Jones, the head of DSS Human Resources and the individual who approved discipline of Plaintiff on account of the two incidents at issue, is a Black man.[12]  None of the people who investigated Plaintiff and decided whether and how to discipline him for the Fountain incident were White men.

5.     Ms. Fountain's letter to Mr. Gatling should have turned into a grievance under the collective bargaining agreement.  Management should have insisted on it.

---

[7]  Pl. Aff. ¶ 7.

[8]  Pl. Aff. ¶ 18.

[9]  Scott Dep. Tr. 8, lines 5-10.

[10]  Harris Dep. Tr. 7, lines 12-16.

[11]  Pl. Aff. ¶ 16.

[12]  Pl. Aff. ¶ 23.

Defendant instead turned the letter into a race discrimination complaint and a workplace violence complaint. This shows bias against Plaintiff on account of his race and color, White, and his gender, male.

6.     Ms. Fountain initiated and continued the hostile confrontation with Plaintiff [13] and was loud and abusive towards Plaintiff.[14]  The Violence in the Workplace Manual, available to DSS HR managers September, 1999,[15] says that shouting, harassing and intimidation are strictly forbidden.[16]  "Violence" includes "intimidating or threatening behaviors" and "verbal abuse." [17]  Early warning signs of workplace violence include "numerous conflicts with supervisors" and "reduced productivity." [18]  "Negative performance review," "unwelcome change in role due to performance or reorganization issue." "criticism of performance," "conflict with … supervisor," and "increased workload or pressure, e.g., deadlines, projects, etc." are all identified by the Manual as "common issues triggering workplace violence."

----

[13]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[14]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[15]  Pl. Ex. I, title page.

[16]  Pl. Ex. I at 3.

[17]  Pl. Ex. I at 4.

[18]  Pl. Ex. I at 13 & 14.

[19] These criteria suggest that Ms. Fountain was the problem. Since Ms. Fountain, not Plaintiff, violated the Governor's policy against violence in the workplace, Ms. Fountain, not Plaintiff, should have been the subject of further investigation. This conclusion is supported by the "threat assessment" portion of the Manual.[20] The State's failure to investigate Ms. Fountain, coupled with its immediate investigation of Plaintiff, shows racial and gender bias.[21]

7.    Plaintiff was treated far worse than his accuser.[22] Ms. Fountain not only escaped investigation and punishment, but as a direct result of her complaint got to keep her job. Ms. Scott asked permission to transfer Ms. Fountain due to serious and longstanding performance deficiencies. Since Ms. Scott was a Black woman she was presumably free from racial and gender bias against Black women. Ms. Harris, citing "Department policy," would not permit the transfer.[23]

8.    Defendant's handling of the Fountain incident was conspicuously unfair

---

[19]  Pl. Ex. I at 14.

[20]  Pl. Ex. I at 15-17.

[21]  The Second Circuit recently condemned gender stereotyping in *Back v. Hastings on Hudson Union Free School Dist.*, ___ F.3d ___ , Docket No. 03-7058, 2004 U.S. App. LEXIS 6684, *19-*22 (April 7, 2004).

[22]  Since Plaintiff is relying on the *Desert Palace* scheme, not the *McDonnell Douglas* scheme, he need not identify comparable Black or female supervisors who were treated better than him.

[23]  Scott Dep. Tr. 30, lines 22-25, page 31, lines 1-10.

to Plaintiff. No one in management, no one in Affirmative Action, and no one in Human Resources showed Plaintiff the complaint Ms. Fountain had made against him.[24] The investigation was over, and the disciplinary process had begun, before he saw the letter or was given a copy.[25]

9.     Affirmative Action and Human Resources investigated Plaintiff together. Ms. Gelzheiser worked with Ms. Harris.[26] Affirmative Action found no cause to believe that racism had anything to do with Plaintiff's conduct in the incident, and prepared a report to that effect,[27] but did not advise Plaintiff that he had been cleared of the most serious charge against him and never gave a copy of the report to Plaintiff and his representatives for use in the disciplinary process.[28] Human Resources knew that Affirmative Action had cleared Plaintiff of the racism charge [29] but it never advised him of that fact and conducted the disciplinary process as if he had not been cleared.[30]

---

[24]  Pl. 18 & 20, Pl. Ex. O.

[25]  Pl. Aff. ¶ 20.

[26]  Gelzheiser Dep. Tr. 117, lines 21-25.

[27]  Harris Dep. Tr. 68, lines 24-25, page 69, line 1.

[28]   Harris Dep. Tr.  74, lines 9-25, page 75, lines 1-25, page 76, lines 1-23.

[29]  Harris Dep. Tr. 77, lines 9-24.

[30]  Pl. Aff. ¶ 30.

-8-

10.     Plaintiff was accused of breaching the Governor's Policy for Prevention of Violence in the Workplace.  At the time of the Fountain incident there were no materials explaining the policy to managers such as Plaintiff [31] and the Bridgeport Office of DSS where Plaintiff worked had not received any training in the policy.[32]  Since on its face it was Ms. Fountain, not Plaintiff, who had violated the policy,[33]  Plaintiff did not know, and could not have known, that his conduct on May 22, 2000 would be taken to have violated the policy.[34]

11.     The statements attached to Ms. Gelzheiser's report on the Fountain incident report show that she had taken her witness statements in June and July, 2000, but none of them were signed until the 26 day period in August when Plaintiff was on suspension as a result of the Onofrio complaint.[35]  Ms. Gelzheiser did not render a report until Aug. 28, 2000, ninety-eight days after the Fountain complaint.[36]  The inference is strong that Ms. Gelzheiser held her report on the

---

[31]  Pl. Aff. ¶ 11; Gelzheiser Dep. Tr. 10, lines 1-21, page 11, lines 1-25.

[32]  Pl. Aff. ¶ 11; Gelzheiser Dep. Tr. 13, lines 2-15, page 15, lines 2-9.

[33]  Pl. Aff. ¶s 13-15.

[34]  Pl. Aff. ¶ 19.

[35]  Pl. Aff. ¶s 21, 23-24.

[36]  Pl. Aff. ¶ 23, Doc. 1-000574 through 1-000577, Pl. Ex. R.

Fountain incident until she had another complaint.

12.     Mr. Jones relied upon the report written by Ms. Gelzheiser when he gave Plaintiff four days suspension without pay [37] for his conduct in the Fountain incident.[38]  That report reveals a strong bias against Plaintiff.

13.     Ms. Gelzheiser did not require Ms. Fountain to sign her statement although the Violence in the Workplace manual for use by HR representatives in State agencies requires signed statements.[39]  Since Ms. Fountain's letter to Mr. Gatling was not signed,[40] Ms. Fountain never had to commit herself to any particular version of the facts.

14.     Ms. Gelzheiser used statements taken by Keith Gatling.  The statements were not reliable since Mr. Gatling was acting as Ms. Fountain's advocate at the time.[41]  Ms. Gelzheiser allowed Mr. Gatling to line up the witnesses, pre-interview them and later sit in on her interviews as the union

---

[37]  See Pl. Aff. ¶ 31, Doc. 21-0000659, Pl. Ex. W.

[38]  Jones Dep. Tr. 24, lines 2-20.

[39]  Pl. Aff. ¶ 21, Pl. Ex. P at 1-000574 through 1-000575, Pl. Ex. I at 50.  Ms. Gelzheiser testified at deposition that there were no rules governing her investigation.  Gelzheiser Dep. Tr. 10, lines 13-21, page 11, lines 1-25.

[40]  See Pl. Ex. O, Def. SJ Ex. 3.

[41]  See J. Myers Statement, dated June 6, 2000, Doc. 1-000596; S. Lee, Doc. 1-0000606, Pl. Ex. S.

representative of the witnesses.[42]  The witnesses discussed their stories with each other.[43]

15.    Despite evidence to the contrary Ms. Gelzheiser never explored the possibility that Ms. Fountain, not Plaintiff, had violated the workplace violence policy.[44]

16.    Ms. Gelzheiser omitted material facts which favored Plaintiff.  Ms. Fountain initiated the incident by accosting Plaintiff in a loud voice.[45]  Ms. Fountain was openly hostile to Plaintiff from the very start of the incident [46] because two days before he had sent her an e-mail appropriately criticizing, in measured, businesslike language, her backlog of overdue work.[47]  The day of the incident was the first day after Ms. Fountain received the e-mail that both she and Plaintiff were at work.[48]  Ms. Fountain refused three attempts by Plaintiff to move discussion of

---

[42]  Gelzheiser Dep. Tr. 106, lines 4-25, page 109, lines 2-25, page 111, lines 1-25.

[43]  Pl. Aff. ¶ 25.

[44]  See Report, dated Aug. 28, 2000, Pl. Ex. R.

[45]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[46]  McLeod Dep. Tr. 62, lines 7-25, page 63, lines 1-8.

[47]  McLeod Dep. Tr. 31, lines 23-25, page 32, lines 1-4 & Docs. 1-000592 & 1-000593, Pl. Ex. J.

[48]  McLeod Dep. Tr. 32, lines 24-25, page 23, lines 1-13.

her grievances to a private office or conference room.[49]  While Plaintiff had a twenty-one year history of outstanding performance and promotions and had received an excellent review from Ms. Scott only six months before,[50] Ms. Fountain was a marginal employee facing discipline or transfer.[51]  Plaintiff, who according to Ms. Fountain was a White racist, was engaged to a Hispanic woman.[52]

17.    Ms. Gelzheiser's report fails to mention the meeting held later on May 22, 2000 to address Ms. Fountain's concerns.  Ms. Fountain, Ms. Scott, Mr. Gatling and Plaintiff sat down together.  That meeting resulted in an agreement. Ms. Fountain would have an opportunity to express her concerns about her workload and would then explore transfer out of the Unit.  At no time during that meeting did Ms. Fountain claim that Plaintiff was violent or motivated by racism. Her racism and violence charges were made well after the fact.[53]  From this piece of evidence alone Ms. Gelzheiser should have concluded that Ms. Fountain was not believable.

---

[49]  McLeod Dep. Tr. 63, lines 4-25.

[50]  See McLeod performance review, Doc. 40-00891, dated Oct. 7, 1999, Pl. Ex. A.

[51]  McLeod Dep. Tr. 21, lines 12-14, page 36, lines 20-25.

[52]  Pl. Aff. ¶s 9, 27.

[53]  G. Scott Dep. Tr. 19, lines 3-20.

18.    Ms. Gelzheiser and Brenda Harris, the Affirmative Action Officer, conducted a joint investigation of the Fountain incident.  Ms. Harris testified that they shared information.[54]  Ms. Fountain's statement to Ms. Harris was not the same as the statement she gave Ms. Gelzheiser.  Ms. Fountain told Ms. Harris that she felt like she "had been raped twice," a strong sexual reference.[55]  The statement to Harris was also full of details, including the claim, explosive if true, that Plaintiff had come towards her with something in his hand, apparently to hit her.[56]  Although she must have known of these discrepancies, Ms. Gelzheiser never mentioned them in her report or drew the necessary inference that Ms. Fountain was not credible.

19.    Ms. Fountain claimed to be afraid of Plaintiff but resisted all attempts to move her out of his Unit until the job she wanted opened up.[57]  Ms. Fountain worked at a desk a short distance away from Plaintiff for over two hundred days.[58]  Ms. Gelzheiser never mentioned this fact in her report.

---

[54]  Harris Dep. Tr. 63, lines 4-14.

[55]  Doc. 1A-000608, Pl. Ex. V.

[56]  Doc. 1A-000608, Pl. Ex. V.

[57]  G. Scott Dep. Tr. 33, lines 1-11; Pl. Aff. ¶ 26.

[58]  McLeod Dep. Tr. 155, lines 10-13.

20.    Ms. Gelzheiser uncritically transmitted biased and unreliable information.  Witnesses Joyce Myers, Scott MacDonald, Rosie Serrano, Seflin Lee and Robert DesPres were facially biased against Plaintiff.  MacDonald admits that he could not hear what Ms. Fountain said to Plaintiff to start the incident but nevertheless claims that he could tell that she was "nonthreatening" and "nonprovoking."  Lori Green and Susan Gwiazda, the witnesses supposedly closest to the incident, claim in their statements to have seen nothing.  Robert DesPres claimed that the incident took place at 9:00 AM or 9:30 AM though every other witness places the incident at 7:30 AM.[59]

21.    Plaintiff felt that he was discriminated against because he was a White man linked to a Hispanic woman.  On Sept. 25, 2000, he asked Ms. Harris to investigate his discrimination complaint, and on Oct. 2, 2000 he proposed a remedy for that discrimination.[60]  Ms. Harris testified at her deposition in this case that she was required to fully investigate Ms. Fountain's complaint of racism against Plaintiff because Department policy required a full investigation of every

---

[59]  Doc. 1-00094 through 1-000604, Pl. Ex. S.

[60]  Harris Dep. Tr. 49, lines 19-24, page 83, lines 2-25; see also memos from Plaintiff to B. Harris, dated Sept. 25, 2000 and Oct. 2, 2000, Pl. Ex. T.

complaint of illegal discrimination.[61]  DSS policy does in fact contain such a

provision.[62]  Ms. Harris neither acknowledged nor investigated Plaintiff's

complaint.[63]

22.    Mr. Jones relied upon the report written by Ms. Gelzheiser when he

disciplined Plaintiff for his conduct in the Onofrio incident.[64]  That report reveals a

strong bias against Plaintiff.

23.    Plaintiff knows, from his nine year personal relationship with Ms.

Onofrio, that she is a personal friend of Ms. Gelzheiser.[65]  Ms. Gelzheiser should

not have been chosen to perform this investigation.

24.    Ms. Gelzheiser omitted material facts which favored Plaintiff.  Ms.

Onofrio had a strong personal motive to injure Plaintiff.  She had been in an

intermittent relationship with Plaintiff for nine years before he broke up with her

and took up with Ms. Flores, also an employee in the Bridgeport office.  Ms.

Onofrio was intensely and publically jealous of Ms. Flores, who had just given birth

---

[61]  See DSS policy on investigation of discrimination complaints, Pl. Ex. I.

[62]  Harris Dep. Tr. 49, lines 19-24.

[63]  Pl. Aff. ¶ 29.

[64]  Jones Dep. Tr. 23, lines 21-25, page 24, lines 1-20.

[65]  Pl. Aff. ¶ 33.

to Derek, Plaintiff's first son.  Ms. Onofrio told Plaintiff that Ms. Flores was a

"fucking spic whore," accused her of sleeping with two hundred men, and claimed

that Derek was not Plaintiff's son.  Ms. Onofrio's feelings were well known in the

Bridgeport office because she made similar statements to other employees.  Ms.

Onofrio publically referred to Derek as Plaintiff's "half spic bastard" son.[66]

25.     Ms. Gelzheiser supposedly suspended Plaintiff because Ms. Onofrio

was afraid of him.[67]  Ms. Onofrio told Ms. Gelzheiser only one day after making her

accusations that she was not afraid of Plaintiff.[68]  She repeated this statement two

more times, once in writing.[69]  Ms. Onofrio also said that she never wanted this to

happen and did not want Plaintiff to be punished.[70]  Despite these statements

Plaintiff was kept out of work for twenty-six days.[71]  The suspension exceeded by

eleven days the maximum suspension permitted by Connecticut State Employee

Personnel Regulations in the absence of proof that the employee's presence at

---

[66]  Pl. Aff. ¶ 32.

[67]  Gelzheiser Dep. Tr. 42, lines 19-25.

[68]  Gelzheiser Dep. Tr. 42, line 25, page 43, lines 1-3.

[69]  Docs. 1-000622 through 1-000625, Pl. Ex. AA.

[70]  Pl. Ex. AA.

[71]  McLeod Dep. Tr. 114, lines 6-21; Gelzheiser Dep. Tr. 43, lines 12-24.

work "could be harmful to the public, the welfare, health or safety of patients, inmates or state employees or state property."  The same regulations say that when such a suspension is imposed the appointing authority "shall provide written notice to the employee stating the reasons for the leave, the effective date of the leave and the duration of the leave." [72]  No such notice was given in Plaintiff's case.[73] Even Rudolf Jones, who could hardly be expected to acknowledge that he had made a bad decision, admitted that such a long suspension was unusual and near the outer edge of permissible.[74]

26.    Ms. Gelzheiser coached Ms. Onofrio.  The first statement Ms. Gelzheiser took from Ms. Onofrio was vague, sketchy and did not say that Plaintiff was violent.[75]  Instead of concluding that Ms. Onofrio lacked credibility and that

---

[72] *See* Conn. Agencies Regs. § 5-240-5a(f):
An appointing authority may place an employee on leave of absence with pay for up to fifteen (15) days to permit investigation of alleged serious misconduct which could constitute just cause for dismissal under C.G.S. Section 5-240-1a (c).  Such leave shall only be utilized if the employee's presence at work could be harmful to the public, the welfare, health or safety of patients, inmates or state employees or state property.  Following a decision to place the employee on such leave, the appointing authority shall provide written notice to the employee stating the reasons for the leave, the effective date of the leave and the duration of the leave which shall not exceed fifteen (15) days.

[73]  Pl. Aff. ¶ 34.

[74]  Jones Dep. Tr. 33, lines 18-25.

[75]  See Docs. 1-000619 through 1-000621. Pl. Ex. X.

Plaintiff had not in fact been violent, Ms. Gelzheiser met with Ms. Onofrio again.

Ms. Gelzheiser testified at deposition that it was not her practice to let witnesses

know what other witnesses had said, but she admitted reading the statements of

Mary Jane Sadler and Keith Gatling aloud to Ms. Onofrio.[76]  She wanted Ms.

Onofrio to give a statement which was consistent with those statements.[77]

     27.    Ms. Gelzheiser ignored material inconsistencies between Ms.

Onofrio's four different accounts of the incident.  The first account was a verbal

statement to Ms. Gelzheiser on Aug. 3, 2000.[78]  The second was a handwritten

account dated Aug. 4, 2000.[79]  The third account was given to Ms. Gelzheiser in

an interview held Aug. 9, 2000.  That interview was reduced to a typewritten

statement signed on Sept. 22, 2000.[80]  The fourth account appears in a

typewritten statement dated

Aug. 17, 2000.[81]  In the first account Ms. Onofrio stated without reservation or

equivocation that Plaintiff had spit in her face.  In the second account Ms. Onofrio

---

[76]  Gelzheiser Dep. Tr. 48, lines 4-20.

[77]  Gelzheiser Dep. Tr. 46, lines 16-24.

[78]  See Doc. 2-000614 through 2-000618, Pl. Ex. Y.

[79]  See Doc. 2-000620-2-000621, Pl. Ex. Z.

[80]  See Doc. 2-000623 through 2-000625, Pl. Ex. AA.

[81]  See Doc. 2-000622, Pl. Ex. AB.

said that she "perceived" that Plaintiff was "about to" spit at her, and turned and
ran to her car.  She then "perceived" what she "believed to be" spit on the back of
her hair but she did not check to see what it was.  In the third account Ms. Onofrio
said that Plaintiff was upset and had a "look on his face as if he was about to
spit."  She cannot say that Plaintiff spit on her hair.  In the fourth account Ms.
Onofrio says that she observed Plaintiff "start to spit."  She then turned her face.
Plaintiff did spit, but she could not be totally sure where it landed; it "may have"
been on the back of her head.

28.    Ms. Gelzheiser drew conclusions which were not justified by the
evidence.  Ms. Gelzheiser concluded that Ms. Onofrio's claim was credible because
she told the same story to several different people, effectively relying on prior
consistent statements.[82]  This conclusion is fatally flawed.  For one thing, Ms.
Onofrio had given materially different statements to Ms. Gelzheiser.[83]  In addition, it
is common sense as well as law that prior consistent statements may not be used
as substantive evidence but only to rehabilitate a witness who has been
impeached.[84]  Prior consistent statements must also have been made at a time

---

[82]  Report, Doc. 2-000614 through 2-000618, Pl. Ex. AC.

[83]  See Pl. Aff. ¶s 36, Docs. 2-000619 through 2-000622 & 2-000625, Pl. Ex. Y, Z & AA.

[84]  *See United States v. Lowe*, 65 F.3d 1137, 1143-45 (4th Cir. 1995).

before any bias, interest or improper motive arose.[85]  Ms. Onofrio's prior

statements were not made in response to impeachment, but rather to a very

sympathetic listener, and were made at a time when she had a strong motive to

fabricate.  It is also apparent that Ms. Gelzheiser helped Ms. Onofrio conform her

statements to those reported by third parties such as Keith Gatling.

29.    Plaintiff received a one day suspension without pay for the Onofrio

incident.[86]  When combined with his four day suspension without pay for the

Fountain incident, Plaintiff lost five days over these incidents, a result virtually

without precedent at DSS.[87]  Ms. Gelzheiser testified that she could not remember

a supervisor ever losing days on grounds like these.[88]  She also testified that she

felt that the one day suspension without pay for the Onofrio incident was too

severe.[89] There should have been a written reprimand.[90]  She had written a

reprimand for Mr. Jones' signature, but he decided not to use it because under

---

[85]  *See* Conn. Code Evid. § 6-11(b)(2); Fed. R. Evid. 801(d)(1)(B); *Tome v. United States*, 513 US 150, 160, 130 L.Ed.2d 574, 115 S.Ct. 696 (1995).

[86]  See Pl. Aff. ¶ 38, Doc. 26-000666, Pl. Ex. AD.

[87]  Pl. Aff. ¶ 38.

[88]  Gelzheiser Dep. Tr. 78, lines 19-25, page 79, lines 1-6.

[89]  Gelzheiser Dep. Tr. 75, line 12-25, page 76, lines 1-19.

[90]  Gelzheiser Dep. Tr. 77, lines 20-22.

principles of progressive discipline Plaintiff deserved some kind of suspension for the Onofrio incident since he had already gotten four days suspension for what he had done to Ms. Fountain.[91]

30.    Some of the discipline for the Fountain and Onofrio incidents was remitted during the union grievance proceedings but Plaintiff still lost two days pay on account of those incidents.[92]  He also lost his reputation.[93]  Plaintiff went from being a star supervisor, with an unbroken record of achievement, to a pariah.  So many people with spotless records compete for relatively few managerial positions at DSS that Plaintiff is unlikely ever to be promoted.[94]

THE PLAINTIFF
RONALD McLEOD


BY_____
WILLIAM B. BARNES, ESQ.
(ct268)
Rosenstein & Barnes
1100 Kings Highway East
P.O. Box 687

---

[91]  Gelzheiser Dep. Tr. 75, lines 10-25, page 76, lines 1-19.

[92]  Pl. Aff. ¶ 39.

[93]  Pl. Aff. ¶ 39.

[94]  Pl. Aff. ¶ 39.

Fairfield CT 06824
Tel (203) 367-7922
Fax (203) 367-8110
wbarnes@rosenbar.com

# CERTIFICATION

A copy of the foregoing was faxed and mailed first class mail, postage prepaid, on April 13, 2004 to the following counsel and pro se parties of record:

Tammy D. Geathers, Esq.
Asst. Attorney General
55 Elm Street
P.O. Box 120
Hartford CT 06141-0120

_____
WILLIAM B. BARNES, ESQ.