UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

RONALD McLEOD                    :      DN 3:02CV1397 (RNC)

v.                               :

STATE OF CONNECTICUT             :      April 12, 2004


# AFFIDAVIT OF RONALD MCLEOD


Now comes RONALD McLEOD, having first been duly sworn, and does

hereby depose and say:

1.    I am over the age of eighteen years and understand the obligation of an

oath.  I make this affidavit of my own personal knowledge.

2.    I am a White man.  I work as an Adult Unit Supervisor in the Bridgeport

Office of the Connecticut Department of Social Services (hereinafter "DSS").  I

have always been regarded as a very good supervisor.  In 2000 I had over twenty

years with the Department.  I received an excellent review in October, 1999 from

my manager, Gail Scott, a Black female.  A true and accurate copy of the review,

dated Oct. 7, 1999, Doc. 40-000891, is attached as Ex. A.  In May, 2000 I

supervised a diverse group of staff, including Georgette Fountain, a Black female.

At that time over 68% of all DSS employees were female and one-third were

members of minority groups.  A true and accurate copy of the DSS Annual Report

for 2000, showing these workforce statistics, is Ex. B.

     3.    The DSS management group in Bridgeport decided to change the Adult

Unit staff to generalists (very simply, everyone does something of everything) from

specialist (everyone gets to specialize) in October, 1999.  The implementation date

was February, 2000.

     4.    Ms. Georgette Fountain, a Black female employee in my Unit, was not

a productive worker in her established position.  She was very reluctant to embrace

the new, more demanding role required of her as a generalist.  I documented her

struggles and discussed them with Gail Scott.  As time went by Ms. Fountain

became more and more upset about the changes ordered by management.  She

became angry, sullen and defiant at work.

     5.    I shared my observations of Ms. Fountain with Ms. Scott, who

suggested that Ms. Fountain be offered a less demanding screener position to

reduce her stress at work.

     6.    Ms. Fountain and I met on Feb. 16, 2000 at the DSS office.  A true

and accurate copy of a paper printout of an e-mail from me to Ms. Fountain, with

notes in my handwriting, is Ex. 1-000011, attached as Ex. C.  I gave Ex. C to Ms.

Scott.  I offered Ms. Fountain the screener position.  I made clear that the idea had come from Ms. Scott and had her full approval.  Ms. Fountain became angry and indignant.  She shook her finger at me and said "Don't you ever tell a Black woman she can't do something."  I replied "I am insulted by that comment - this meeting is over." A true and accurate copy of Ex. 1-000018 is attached as Ex. D.  I advised Ms. Scott of this comment.  True and accurate copies of e-mail on this subject, with notations, dated Feb. 16 through Feb. 23, 2000, are attached as Ex. E.

7.     DSS policy strictly forbids racial comments in the workplace.  A true and accurate copy of the DSS policy, taken from its web site, is attached as Ex. F. I could have filed a complaint against Ms. Fountain.  I chose not to do so because I believed that she was an unhappy person who was undergoing a lot of stress.  I did not want to make the situation worse.  I knew that Gail Scott was well aware that I was not a racist.

8.     I sent Ms. Fountain an e-mail on Feb. 22, 2000 confirming our discussion of Feb. 16, 2000 regarding her performance deficiencies.  See Ex. E. She printed it out, wrote on the copy that at the end of the meeting I had accused her of reporting me to Affirmative Action, and gave it to me.  See Ex. E.  This was not true and in addition made no sense since I did not know whether Ms. Fountain had ever been to the Affirmative Action office.  In any case the suggestion that she

-3-

take a screener position had come from Ms. Scott.  I gave a copy of Ms. Fountain's note to G. Scott with my own notes about the meeting on Feb. 23, 2004.  See Ex. E.

9.     Ms. Fountain introduced race into the discussion of her deficiencies at work purely as a tool, to threaten me.  I was on otherwise good terms with her.  Ms. Fountain visited my now-wife, then fiancé, Almelinda Flores, in the hospital when my son Derek was born on April, 12, 2000.

10.     Ms. Fountain had made alleged racial discrimination against her an issue, and raised her race as a defense to complaints about her performance, with a prior supervisor during her assignment to an Adult Convalescent Unit.  The supervisor, Ms. Joan Zietowski, was White.

11.     Governor Rowland on Aug. 4, 1999 issued a Proclamation on Violence in the Workplace Prevention Policy: Executive Order No. 16.  A true and accurate copy of the policy, Docs. 38- 000018 through 38-000019, is attached as Ex. G.  A true and accurate copy of a Memo about the policy dated June 14, 2000 from Patricia Wilson-Coker, Commissioner of DSS, is attached as Ex. H.  Despite the promises made by Comm'r Wilson-Coker in Ex. H, we did not get explanatory materials or training.  The Violence in the Workplace Polices and Procedures Manual prepared by the State of Connecticut Department of Public Works, Risk

-4-

Management Unit, in September, 1999, was not distributed to our office.  A true and accurate copy of that Manual is attached as Ex. I.  Certainly I never saw it. The DSS staff in Bridgeport did not get explanatory materials and training on the order until Jan. 16, 2001, seventeen months and twelve days after the Governor issued his executive order.

12.     I sent Ms. Fountain an e-mail on May 18, 2000.  I criticized her work performance.  I told her that her pending workload was not acceptable.  This was another way of saying that she was not finishing her assignments in the allotted time.  A true and accurate copy of that e-mail is Ex. 1 - 000019, is attached as Ex. J.  I was out of work the following day and did not speak to Ms. Fountain about the issue raised by my e-mail to her until Monday, May 22, 2000.

13.     On May 22, 2000, Ms. Fountain came to work with an angry and defensive attitude because I had criticized her work on May 18, 2000.  She was also generally frustrated by the changes in the Unit.  Ms. Fountain accosted me in a loud voice on the work floor.  A discussion ensued.  I got upset.  We were both loud.  Three times I asked Ms. Fountain to retire to a private setting to talk.  Each time she refused.  I did not make any racial, sexual, violent or profane remarks to Ms. Fountain during the incident.  Later that day I met with Ms. Fountain, Gail Scott and Union representative Keith Gatling, a Black man.  The meeting ended

with an agreement. Ms. Fountain would talk about her current work issues and then explore a transfer out of the Unit. I told Ms. Scott that I felt that Ms. Fountain had been loud, aggressive and insubordinate to me during the incident. True and accurate copies of Docs. 1-00002 and 1-00003, my communications to Ms. Scott, are attached as Ex. K.

14.    The Violence in the Workplace Manual, Ex. I, says at page 3 that shouting, harassing and intimidation are strictly forbidden. The Manual says at page 4 that "violence" includes "intimidating or threatening behaviors" and "verbal abuse." At pages 13 & 14 the Manual says that early warning signs of workplace violence are "numerous conflicts with supervisors" and "reduced productivity." "Negative performance review," "unwelcome change in role due to performance or reorganization issue." "criticism of performance," "conflict with … supervisor," and "increased workload or pressure, e.g., deadlines, projects, etc." are all identified by the Manual as "common issues triggering workplace violence." Manual, at page 14. If the criteria set in the Manual are used, Ms. Fountain violated the Governor's policy against violence in the workplace and should definitely have been the subject of further investigation. See the "threat assessment" portion of the Manual, Ex. I, at pages 15-17. The fact that I was charged and investigated, and she was not, strongly suggests that ,my race and color, White, and my sex, male, factored into

-6-

the decision.

15.    It never occurred to me to charge Ms. Fountain with violation of the

Governor's workplace violence policy.  I did not want to make things worse.  I

though that her workplace difficulties would be handled through the mechanisms

provided by the collective bargaining agreement.  I knew from my thirteen years of

experience as a supervisor that an incident like the one with Ms. Fountain on May

22, 2000 would normally result in a union grievance which would address the e-

mail I had written to Ms. Fountain on May 18, 2000 and the incident of May 22,

2000.  The grievance might also cover the rest of Ms. Fountain's problems in the

Unit.  To my surprise no grievance was filed.

16.    I sent Lynn Gelzheiser, the Human Resources person who handled our

office, an e-mail on May 27, 2000.  Ms. Gelzheiser is a White woman.  I wanted to

know the definition of insubordination used in the Department.  I had two purposes

in making this request.  The first was to help me decide if Ms. Fountain had

actually been insubordinate to me on May 22, 2000.  The second purpose was to

help me recognize insubordination and deal with it in the future.  A true and

accurate copy of that e-mail is Doc. 15-000073, attached as Ex. L.  I learned that

insubordination at DSS is not a matter of attitude but rather direct refusal to

perform an assigned task.  As a result I never charged Ms. Fountain with

-7-

insubordination.

17.    Ms. Fountain stayed in my Unit after the May 22, 2000 incident.  She was even less productive than before.  She also had a very bad attitude - aloof, arrogant and challenging.  On June 1, 2000 I sent Gail Scott an e-mail complaining about this situation.  A true and accurate copy is Doc. 5-000642, Ex. M hereto.  I sent Ms. Scott another e-mail on June 30, 2000, a true and accurate copy of which is Doc. 7-000644, attached as Ex. N.  Instead of responding to the problem Ms. Gelzheiser rebuked me for using e-mail to address the problem.

18.    Gail Scott and I had a one on one meeting on June 5, 2000.  Ms. Scott said that Ms. Fountain had sent a letter to Keith Gatling about me in connection with the May 22, 2000 incident.  She copied Comm'r Wilson-Coker, a Black woman, and the NAACP.  Ms. Fountain had also filed a formal violence in the workplace complaint against me in connection with that incident.  Ms. Scott told me that Human Resources (Lynn Gelzheiser) and Affirmative Action (Brenda Harris, a Black woman) would conduct a dual investigation.  I was not shown the letter written by Ms. Fountain.

19.    Ms. Scott did not tell me what a formal violence in the workplace complaint was or how I was supposed to deal with it.  At that time we had not had any training in the workplace violence policy.  I did not know how my conduct on

May 22, 2000 could possibly have violated that policy. I had no warning on what conduct on my part might violate that policy.

20.    I was not told why there would be two investigations of my conduct, by two different offices, and how I was supposed to respond to them. A true and accurate copy of Ms. Fountain's letter, which I received for the first time much later, while the disciplinary proceeding was underway, is attached as Ex. O. The letter is also Def. Summary Judgment Ex. 3.

21.    Ms. Gelzheiser took only one statement in June, an interview with Ms. Fountain, Ms. Harris and Mr. Gatling on June 20, 2000. See Doc. 1-000574 through 1-000577, a true and accurate copy of which is attached hereto as Ex. P. Although the Manual on Workplace Violence prescribes the manner in which workplace violence complaints must be investigated, See Ex. I, Manual at 50, and says that statements must be signed, Ms. Fountain's statement was not signed. See Ex. P at 1-000574 through 1-000575. It is the only statement Ms. Gelzheiser took which was not signed. Ms. Fountain's letter to Mr. Gatling had not been signed either. Ms. Fountain was never made to commit herself to her version of the facts.

22.    Ms. Gelzheiser used statements taken by Mr. Gatling although he was acting as Ms. Fountain's advocate and therefore the statements were most likely

not reliable.  True and accurate copies of the J. Myers statement to K. Gatling,
dated June 6, 2000, Doc. 1-000596, and S. Lee statement to K. Gatling, dated
June 6, 2000, Ex. 1-000606, are attached hereto as Ex. Q.  Ms. Gelzheiser also let
Mr. Gatling pre-interview the witnesses and sit in on the interviews as the union
representative.

23.    Ms. Gelzheiser took statements from other witnesses in mid July,
2000, six weeks after Ms. Fountain wrote her letter.  The delay prejudiced me.
When so much time goes by between the event and the statement, witness
memories fade and people get either tired of the subject or forget significant
details.  There is no explanation for the delay.  Ms. Gelzheiser did not render a
report until Aug. 28, 2000, ninety-eight days after Ms. Fountain's complaint.  A
true and accurate copy of Ms. Gelzheiser's report to Rudolf Jones on the Fountain
incident, Docs. 1-000574 through 1-000577 is attached as Ex. R.  Mr. Jones is a
Black man.  It is apparent that Ms. Gelzheiser never even considered the possibility
that Ms. Fountain might have been the one who had violated the Violence in the
Workplace Policy on May 22, 2000.

24.    Ms. Gelzheiser did not have the witness statements typed and signed
until mid to late August, 2000.  See S. MacDonald (interviewed July 13, statement
signed Aug. 29, 2000); J. Myers (interviewed July 13, statement signed Aug. 18,

2000); K. Angelica (interviewed July 17, statement signed Aug. 29, 2000); P. Coughlin (interviewed July 17, 2000); L. Green (interviewed July 17, statement signed Aug. 18, 2000); S. Gwiazda (interviewed July 17, statement signed Aug. 28, 2000); P. Petrone (interviewed July 17, statement signed Aug. 28, 2000); R. DesPres (interviewed July 17, statement signed Aug. 24, 2000); R. Serrano (interviewed July 13, statement signed Aug. 18, 2000); S. Lee (interviewed July 13, statement signed Aug. 18, 2000).  True and accurate copies of these statements are Docs. 1-000594 through 1-000595; 1-000597 through 1-000605, attached hereto as Ex. S.  Every statement was taken a month or more before it was signed, and every statement was signed while I was out of work on suspension.

25.    In June and July, 2000, my Unit at DSS was buzzing with the news of Ms. Gelzheiser's investigation.  There was absolutely no confidentiality.  I heard employees comparing stories before they were interviewed by Ms. Gelzheiser.

26.    Although Ms. Fountain claimed over and over to be afraid of me, she resisted all attempts to move her out of my Unit until the job she wanted opened up.  Ms. Fountain worked at a desk a short distance away from me for over two hundred days .  This would never have happened if, as Ms. Fountain claimed, she was afraid of me because I had attacked her.  Ms. Gelzheiser never took account of

this fact.

27.     Ms. Gelzheiser omitted material facts which favored me.  Ms.
Fountain initiated the incident by accosting me in a loud voice.  Ms. Fountain was
openly hostile to me from the very start of the incident  because two days before I
had sent her an e-mail appropriately criticizing, in measured, businesslike language,
her backlog of overdue work.  The day of the incident was the first day after Ms.
Fountain received the e-mail that she and I were both at work.  I tried three times
to move discussion of Ms. Fountain's grievances to a private office or conference
room.  She refused to go.  While I had a twenty-one year history of outstanding
performance and promotions and had received an excellent review from Ms. Scott
only six months before, Ms. Fountain was a marginal employee facing discipline or
transfer.  According to Ms. Fountain I was a White racist but  as she and everyone
else in the Unit knew I was then engaged, now married, to a Hispanic woman!

28.     Ms. Gelzheiser never mentioned the meeting which took place later on
May 22, 2000 in which Ms. Fountain, Gail Scott, Keith Gatling and I discussed a
peaceful resolution of Ms. Fountain's grievances.  See ¶ 13, above.  Ms. Fountain
said nothing at that meeting about me being a racist or violent.  Those charges
were made well after the meeting.  This alone destroyed Ms. Fountain's  credibility.

29.     I felt that I was being discriminated against because I was a White

-12-

man linked to a Hispanic woman.  On Sept. 25, 2000, I asked Ms. Harris to

investigate his discrimination complaint, and on Oct. 2, 2000 I proposed a remedy

for that discrimination.  True and accurate copies of the memos I gave Ms. Harris

are attached as Ex. T.  Ms. Harris testified at her deposition in this case that she

was required to fully investigate Ms. Fountain's complaint of racism against me

because Department policy required a full investigation of every complaint of illegal

discrimination.  DSS policy does in fact contain such a provision.  True and

accurate copies of pages from the Department's web site showing the policy are

attached as Ex. U.  Ms. Harris neither acknowledged nor investigated my

complaint.

30.    Ms. Harris prepared a report clearing me of Ms. Fountain's charges of

racism and sexism.  She never told me or my union representatives that I had been

exonerated or gave me a copy of her report.  Ms. Harris told Ms. Gelzheiser of the

result and of the report but Ms. Gelzheiser did not tell me about them either.  I

could have used the results of the report to defend myself in the disciplinary

proceedings.  I was unable to do so since I did not know of them.  I never saw Ms.

Harris' report until it was produced in discovery in this lawsuit.  A true and

accurate copy of Ms. Harris's report on the Fountain incident, Docs. 1-000607

through 1-000609, is attached as Ex. V.  The report misspells my name

-13-

throughout.  Ms. Harris says that she met with Ms. Fountain on May 31, 2000 and

with Ms. Fountain, Ms. Gelzheiser and Mr. Gatling on June 22, 2000.  Ms. Harris

reports that Ms. Fountain said that she felt "like she had been raped twice."  Ms.

Harris also reports that Ms. Fountain said that I was coming towards her with

something in my hand, presumably to hit her.  I never had anything in my hand and

I never came towards Ms. Fountain with anything in my hand.  I never intended to

hit her, on May 22, 2000 or at any other time.  Although Ms. Harris and Ms.

Gelzheiser worked together on the investigation Ms. Gelzheiser never noted the

extraordinary difference between the statement Ms. Fountain gave to her and the

statement she gave to Ms. Harris.

31.    Mr. Jones gave me a four day suspension without pay for the

Fountain incident.  A true and accurate copy of the suspension letter, Doc. 21-

000659, is attached as Ex. W.

32.    On Aug. 3, 2000 I had words with Connie Onofrio, another supervisor

in the Bridgeport DSS building.  Connie had been in an intermittent relationship with

me for nine years before I broke up with her and took up with another employee in

the Bridgeport office, Almelinda Flores, in 1998.  At that time Ms. Onofrio was

intensely and publically jealous of my wife, who had just given birth to Derek, my

first son.  On another occasion Ms. Onofrio had told me that Ms. Flores was a

"fucking spic whore," had accused her of sleeping with two hundred men, and had claimed that Derek was not my son.  Ms. Onofrio's feelings were well known in the Bridgeport office because she made similar statements to other employees.  Ms. Onofrio publically referred to Derek as my "half spic bastard" son.  I was standing on the steps of a landing at the back of the building where people went to smoke cigarettes.  She came by me.  I told her that I didn't want to hear her saying things like that any more and that we would have no relationship at all if she kept it up.  Later that day Ms. Onofrio accused me of attacking her.

33.    Although she did not want to admit it during her deposition, I know from my long personal relationship with Ms. Onofrio that she is a personal friend of Ms. Gelzheiser.

34.    Ms. Gelzheiser suspended me for twenty-six days, supposedly because Ms. Onofrio was afraid of me.  Ms. Onofrio told Ms. Gelzheiser only one day after making her accusations that she was not afraid of me.  She repeated this statement two more times, once in writing.  Ms. Onofrio also said that she never wanted this to happen and did not want me to be punished.  Despite these statements I was kept out of work for twenty-six days, an incredible length of time.  State regulations limit suspensions to fifteen days and the employee is supposed to get notice of the length of the suspension and why it was imposed.  I

-15-

never got such a notice.  Even Rudolf Jones admitted that such a long suspension

was unusual and near the outer edge of permissible.

35.    Ms. Gelzheiser coached Ms. Onofrio in giving a statement against me.

The first statement Ms. Gelzheiser took from Ms. Onofrio was vague, sketchy and

did not say that I was violent.  A true and accurate copy of that statement, Doc. 1-

000619 through 1-000621, is attached as Ex. X.  Instead of concluding that Ms.

Onofrio lacked credibility and that I had not in fact been violent, Ms. Gelzheiser met

with Ms. Onofrio again.  Ms. Gelzheiser testified at deposition that it was not her

practice to let witnesses know what other witnesses had said, but she admitted

reading the statements of Mary Jane Sadler and Keith Gatling aloud to Ms. Onofrio.

She wanted Ms. Onofrio to give a statement which was consistent with those

statements.

36.    Ms. Gelzheiser ignored material inconsistencies between Ms.

Onofrio's four different accounts of the incident.  The first account was a verbal

statement to Ms. Gelzheiser on Aug. 3, 2000.  A true and accurate copy of that

statement, Doc. 2-000614 through 2-000618, is attached as Ex. Y.  The second

was a handwritten account dated Aug. 4, 2000.  A true and accurate copy of that

statement, Doc. 2-000620 through 2-000621, is attached as Ex. Z.  The third

account was given to Ms. Gelzheiser in an interview held Aug. 9, 2000.  That

interview was reduced to a typewritten statement signed on Sept. 22, 2000.  A

true and accurate copy of that statement, Doc. 2-000623 through 2-000625, is

attached as Ex. AA.  The fourth account appears in a typewritten statement dated

Aug. 17, 2000.  A true and accurate copy of that statement, Doc. 2-000622, is

attached as Ex. AB.  In the first account Ms. Onofrio stated without reservation or

equivocation that I had spit in her face.  In the second account Ms. Onofrio said

that she "perceived" that I was "about to" spit at her, and turned and ran to her

car.  She then "perceived" what she "believed to be" spit on the back of her hair

but she did not check to see what it was.  In the third account Ms. Onofrio said

that I was upset and had a "look on his face as if he was about to spit."  She

cannot say that I spit on her hair.  In the fourth account Ms. Onofrio says that she

observed me "start to spit."  She then turned her face.  I did spit, she says, but she

could not be totally sure where it landed; it "may have" been on the back of her

head.

37.    In her report, Docs. 2-000614 through 2-000618, a true and accurate

copy of which is Ex. AC, Ms. Gelzheiser drew conclusions which were not justified

by the evidence.  Ms. Gelzheiser concluded that Ms. Onofrio's claim was credible

because she told the same story to several different people, effectively relying on

prior consistent statements.  This conclusion is fatally flawed.  For one thing, Ms.

-17-

Onofrio had given materially different statements to Ms. Gelzheiser.  In addition, it is just common sense that prior consistent statements are not evidence of the substance.  A person can tell the same lie more than once.  Prior consistent statements must have been made at a time before any bias, interest or improper motive arose.  Ms. Onofrio's prior statements were made in response to a very sympathetic listener at a time when she had a strong motive to fabricate.  It is also obvious that Ms. Gelzheiser helped Ms. Onofrio conform her statements to those reported by third parties such as Keith Gatling.

38.     I got a one day suspension without pay for the Onofrio incident.  A true and accurate copy of my suspension letter, Doc. 26-000666, is attached as Ex. AD.  When combined with my four days suspension without pay for the Fountain incident, I lost five days of pay.  This is without precedent at DSS.  I have never heard of such a thing in twenty-two years at the Department.  Ms. Gelzheiser testified that she could not remember a supervisor ever losing days on grounds like these.  She also testified that she felt that the one day suspension without pay for the Onofrio incident was too severe.  There should have been a written reprimand. She had written a reprimand for Mr. Jones' signature, but he decided not to use it because under principles of progressive discipline I deserved some kind of suspension for the Onofrio incident since I had already gotten four days suspension

for what I had done to Ms. Fountain.

39.    Some of the discipline for the Fountain and Onofrio incidents was remitted during the union grievance proceedings but I still lost two days pay on account of those incidents.  I also lost my reputation.  I went from being a star supervisor, with an unbroken record of achievement, to a pariah.  So many people with spotless records compete for relatively few managerial positions at DSS that I am unlikely ever to be promoted.


_____
RONALD McLEOD

STATE OF CONNECTICUT        )
                           )    SS: TOWN OF FAIRFIELD
COUNTY OF FAIRFIELD         )

    RONALD McLEOD, known or sufficiently proved, subscribed and swore this ____ day of April, 2004, to the truth of the foregoing before me.


_____
WILLIAM B. BARNES
Comm'r of the Superior Court